UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PLUMBERS & GASFITTERS UNION LOCAL NO. 75 HEALTH FUND,
PLUMBERS LOCAL 75 EDUCATION FUND,
STEVE BREITLOW,
   *in his capacity as Trustee,*
PLUMBING INDUSTRY DEVELOPMENT FUND, INC.,
BUILDING TRADES UNITED PENSION TRUST FUND, and
WILLIAM BONLENDER,
   *in his capacity as Trustee*,

   **Plaintiffs,**

                                                   **Case No. 24-CV-907-SCD**

   **v.**

SOUTH SHORE PLUMBING LLC,
ROBERT J. GOSLINE, and
D'ANN L. GOSLINE,

   **Defendants.**

## DECISION AND ORDER

   The Plaintiffs—various health and pension funds—allege that South Shore Plumbing LLC failed to contribute to the funds between 2022 and 2025 as required by contracts and federal statutes. The Funds also argue that they should be permitted to pierce the corporate veil and hold South Shore's owners, Robert and D'Ann Gosline, liable for these delinquencies.

   In July 2024, the Funds, through their trustees, filed a complaint in federal court against South Shore. *See* ECF No. 1. In count 1, the Funds alleged that South Shore violated § 502 of the Employee Retirement Income Security Act. *See id.* at 7. In count 2, the Funds alleged that South Shore violated § 301 of the Labor Management Relations Act. *See id.* at 9. In June 2025, the Funds moved for leave to amend their complaint to include Robert and D'Ann Gosline as defendants, which South Shore opposed. *See* ECF Nos. 10, 14, 15. Then,

the case was re-assigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 11–13. In July 2025, the Funds moved for summary judgment against South Shore, filing a brief in support of their motion, proposed findings of fact, and affidavits and exhibits. *See* ECF Nos. 16–23. South Shore responded with a response brief and affidavits, and later an untimely response to the Funds' proposed findings of fact. *See* ECF Nos. 25, 28. The Funds also filed a reply brief. *See* ECF No. 26.

After the Funds' first motion for summary judgment against South Shore, I granted the Funds' motion to amend the complaint. *See* Order, ECF No. 29. The amended complaint adds new claims against Robert and D'Ann Gosline for violating ERISA and the LMRA. *See* ECF No. 30 at 11, 13. In November, the Funds moved for summary judgment against the Goslines; they also filed proposed findings of fact, a brief in support, and affidavits and exhibits. *See* ECF Nos. 33–36. The Goslines filed a response to the motion and a response to the Funds' proposed findings of fact. *See* ECF Nos. 41, 42. The Funds filed a reply brief that includes a motion to strike one of the Goslines' fact responses and an affidavit in support of the motion to strike. *See* ECF Nos. 45, 46. The Goslines did not respond to Funds' motion to strike.

The Goslines also moved for summary judgment against the Funds, filing a brief in support and proposed findings of fact. *See* ECF Nos. 38–40. The Funds filed an omnibus document that includes: a motion to strike untimely arguments from the Goslines' brief, a response brief, and substantive disputes to the Goslines' proposed findings of fact. *See* ECF No. 43. The Funds also provided an "answer" to the Goslines' proposed findings of fact. *See* ECF No. 44. The Goslines did not reply or respond to the motion to strike.

I will first consider the Funds' motion for summary judgment against South Shore. Second, I will consider the cross-motions for summary judgment as to claims against the Goslines personally.

## LEGAL STANDARD

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). The court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## THE FUNDS' MOTION FOR SUMMARY JUDGMENT AGAINST SOUTH SHORE

## BACKGROUND

I take these facts from the Funds' proposed findings of fact in support of their first summary-judgment motion, which were uncontroverted and therefore deemed admitted for the purpose of deciding summary judgment.[1] *See* Pls.' Facts, ECF No. 17; E.D. Wis. Civ. L.R. 56(b)(4); Fed. R. Civ. P. 56(e)(2).

---

[1] South Shore's proposed facts and response to the Funds' proposed facts were untimely and, for most paragraphs, did not cite to the record. *See* Def.'s Resp. to Pls.' Facts, ECF No. 28; Fed. R. Civ. P. 56(c)(1); E.D. Wis. Civ. L.R. 56(b)(2); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact. And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material.").

Robert and D'Ann Gosline own and operate South Shore, which is an LLC. *See* Pls.' Facts ¶¶ 9, 55, 66. On February 3, 2012, South Shore entered a Memorandum of Labor Agreement (MOA) with Plumbers Union Local 75. *See* Pls.' Facts ¶ 11. Robert Gosline signed for South Shore, and Steve Breitlow signed for the Union. *See* Pls.' Facts ¶ 11; Sterling Aff. Ex. 1, ECF No. 22-1. The MOA incorporated collective bargaining agreements between the Union and the Plumbing and Mechanical Contractors Association of Milwaukee and Southeastern Wisconsin. *See* Pls.' Facts ¶¶ 12–13. The MOA also incorporated trust agreements or other governing documents for the Pension Fund, Health Fund, Training Fund, and Industry Development Fund. *See* Pls.' Facts ¶ 15; Sterling Aff. Ex. 1.

The MOA acknowledged that the parties would automatically adopt successor CBAs unless one party properly terminated the agreements. *See* Pls.' Facts ¶ 14. This is the key language:

> The parties hereby adopt and incorporate into this document the [CBAs] between the Union and the [Association], effective from June 1, 2008 through May 31, 2012, covering the above described units (the Contracts). The Contracts and this adoption of the Contracts shall remain in effect up to and including the expiration date of the Contracts. The Contracts shall continue in effect from year to year thereafter, and the parties hereby adopt any successor agreements entered into between the Union and the [Association] unless notice of termination or amendment is given no less than sixty (60) days prior to the expiration date of the Contracts.

Sterling Aff. Ex. 1, at 1. Since 2012, the Union and the Association have entered another CBA effective June 4, 2018 through May 31, 2023, and another effective June 1, 2023 through May 31, 2026. *See* Pls.' Facts ¶ 16. Under the terms of these CBAs, employers contribute to the funds for each hour that each employee performs work covered by the CBAs. *See* Pls.' Facts ¶¶ 18, 23, 27. Payments are to be made no later than the fifteenth day of the month following

the month in which the work was performed. Pls.' Facts ¶¶ 21, 25, 28, 32. Delinquent

payments are subject to liquidated damages and interest. Pls.' Facts ¶¶ 22, 26, 29, 33.

In March 2012, Robert Gosline signed the Alumni Agreement. *See* Pls.' Facts ¶ 55.

The Alumni Agreement allowed Robert Gosline (an "alumni employee") to participate in the

pension fund when he would otherwise be ineligible under a CBA. *See* Pls.' Facts ¶¶ 57, 60.

The Alumni Agreement remains in effect while the signatory employer—here, South Shore

has an obligation under a CBA to pay into the Pension Fund for other employees. *See* Pls.'

Facts ¶¶ 56, 61.

On July 23, 2019, Robert Gosline sent this letter:

**SOUTH SHORE PLUMBING**
4075 S. Clement Avenue
Milwaukee, WI 53207
(414) 881-7979
www.southshoreplumbingllc.net
southshoreplumbingllc@yahoo.com

July 23, 2019

Ms. Maribeth Haumschild
Plumbers Union Local 75
11175 W. Parkland Avenue
Milwaukee, WI 53224

Re: Resignation

Dear Ms. Haumschild,

This letter is to inform Plumbers Union Local 75 that I am resigning as a union member, effective June 24, 2019.

Thank you very much for the opportunities for professional and personal development that you have provided me during the last 35 years. I have enjoyed working with Plumbers Union Local 75 and appreciate the support provided to me during my tenure with you.

Sincerely,

Robert J. Gosline
South Shore Plumbing, LLC

5

Sterling Aff., Ex. 2. In response, the bookkeeper for the Union sent this email to the fund manager of the Pension Fund:

> **From:** MariBeth Haumschild [mailto:maribeth@plumbers75.com]
> **Sent:** Wednesday, September 04, 2019 11:29 AM
> **To:** 'charlieb@thepensionfund.com' <charlieb@thepensionfund.com>
> **Cc:** D'Ann Gosline <DGosline@irgens.com>
> **Subject:** Robert Gosline
>
> Good Morning Charlie:
>
> I can confirm that Robert Gosline resigned his membership with Plumbers Local 75 effective July 31, 2019.
>
> If you need anything else please free to reach out to me.
>
> Thanks
> Maribeth
> Bookkeeper
> Plumbers Local 75

Sterling Aff. Ex. 2, at 2; Pls.' Facts ¶¶ 65–66; Pls.' Br. 4, ECF No. 23.

On April 23, 2024, an audit revealed that South Shore had not contributed to the Health Fund, Training Fund, or Industry Development Fund between January 2022 and March 2024. *See* Pls.' Facts ¶¶ 37–39. On July 2, 2025, another audit of payroll records revealed that South Shore had not contributed to the Health Fund, Training Fund, or Industry Development Fund between April 2024 and March 2025 (after the Funds had filed their complaint in federal court in July 2024). *See* Pls.' Facts ¶¶ 42–43.

The Pension Fund's auditor used information from these previous audits to estimate delinquencies to the Pension Fund. *See* Pls.' Facts ¶¶ 47–48; Karsten Aff. 2, ECF No. 21. Until December 2024, South Shore continued contributing to the Pension Fund, but only for hours worked by Robert Gosline himself. *See* Pls.' Facts ¶ 62. The Alumni Agreement requires paying contributions to the Pension Fund for covered work done by the alumni employee or other employees. *See* Pls.' Facts ¶¶ 53–58; Goslines' Br. in Supp. Summ. J. 1, ECF No. 39

6

("South Shore Plumbing LLC has never employed more than four (4) employees at any time, including Bob himself.") (no citation to a proposed fact or to evidence in the record). Altogether, the auditors estimated these delinquencies:

| Time Period | Fund | Unpaid Contributions | Liquidated Damages | Interest | Total |
|---|---|---|---|---|---|
| January 2022–March 2024 | Health Fund | 53,319.52 | 8,172.85 | 9,580.99 | 71,073.36 |
| | Training Fund | 8,929.19 | 1,333.96 | 1,510.72 | 11,773.87 |
| | Industry Development Fund | 1,114.18 | 169.53 | 197.92 | 1,481.63 |
| April 2024 – March 2025 | Health Fund | 17,417.70 | 3,483.55 | 3,100.85 | 24,002.10 |
| | Training Fund | 3,159.50 | 631.91 | 562.47 | 4,353.88 |
| | Industry Development Fund | 372.67 | 74.54 | 66.35 | 513.56 |
| January 2022—September 2024 | Pension Fund | 90,705 | 18,141.03 | 37,498.83 | 146,345.01 |

*See* Pls.' Facts, ¶¶ 39–41, 44–46, 47; Karsten Aff., ECF No. 21; Pls.' Br. 5.

**DISCUSSION**

The undisputed facts show that South Shore violated ERISA § 502 and LMRA § 301, and the Funds are entitled to summary judgment.

**I.      Funds are entitled to summary judgment on their ERISA claim against South Shore.**

The Employee Retirement Income Security Act of 1974 "adds the force of federal law to the general requirements of contract law and requires an employer to make pension contributions to which he has agreed under a collective bargaining agreement." *Cent. States Pension Fund v. Sloan*, 714 F. Supp. 943, 949 (N.D. Ill. 1989). Section 515 of the Act reinforces the obligation: "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. Section 502 specifies

7

the remedy for violating that obligation: in an action to enforce ERISA in which a judgment in favor of the plan is awarded, the court shall award the plan unpaid contributions, interest on unpaid contributions, liquidated damages provided for by the plan up to 20 percent of unpaid contributions, and attorney's fees. *See* 29 U.S.C. § 1132(g)(2).

"ERISA protects employee benefit funds against uncertainty and employees against loss of benefits." *Cent. States, Se. & Sw. Areas Pension Fund v. Transervice Logistics, Inc.*, 56 F.4th 516, 524 (7th Cir. 2022). Many agreements subject to ERISA and the LMRA, including the MOA here, include "evergreen clauses" stating that the agreement will automatically renew each year after expiring if the agreement isn't terminated during the termination window. *See id.* at 525 n.1. "An 'evergreen' clause is designed to promote stability in labor relations by providing that the terms of an existing collective bargaining agreement remain in effect, through automatic renewal, unless and until a party expressly terminates the agreement in a timely way." *Id.* at 522. Evergreen clauses are strictly enforced, especially in the ERISA context: "Strict compliance with an evergreen clause's requirements for termination is especially important when a third-party beneficiary such as the plaintiff fund must make decisions based on the conduct of the parties to the contract without being involved in or even privy to extrinsic evidence such as the course of negotiations." *Id.* at 525.

South Shore argues that Robert Gosline's July 23, 2019 letter terminated the MOA, ending South Shore's obligation to contribute to the Funds. This question is a "purely legal one," requiring me to interpret and apply the MOA and Robert Gosline's letter to decide whether South Shore terminated its obligations to the Funds. *Cent. States v. Univar Sols. USA Inc.*, 148 F.4th 426, 430 (7th Cir. 2025). "When considering a termination defense involving an evergreen clause, 'each [case] treats the question at hand as the best way to understand a

particular contract.'" *Transservice Logistics*, 56 F.4th at 525 (quoting *Office & Pro. Emps. Int'l Union, Local 95 v. Wood Cnty. Tel. Co.*, 408 F.3d 314, 316 (7th Cir. 2005)). "We look to the language of the evergreen clause establishing the method of termination and analyze whether the alleged notice complied." *Id.* "We apply federal common law to interpret CBAs establishing ERISA plans, drawing on general principles of contract law to the extent those principles are consistent with ERISA." *Univar Sols.*, 148 F.4th at 430.

For example, in *Transservice Logistics*, the parties' negotiation of a successor agreement did not terminate the previous agreement. *Transservice Logistics*, 56 F.4th at 526–27. In that case, prior to the termination window, the union president sent letters to employers expressing a desire to negotiate a new agreement. *Id.* at 523. The letters did not "use[] the word 'terminate' or any synonym. And neither employer replied to the letters saying it wanted the collective bargaining agreement to terminate." *Id.* "Notice was insufficient because the evergreen clause required a 'notice of termination,' and nothing in the letter expressed any intent to terminate the existing agreements. In other words, because a request to negotiate is not notice to terminate, the party's request to negotiate failed to put the fund on notice of termination." *Univar Sols.*, 148 F.4th at 431.

On the other hand, in *Rutherford v. Judge & Dolph*, a union provided timely, unambiguous notice to overcome an evergreen clause and terminate a CBA. 707 F.3d 710, 712 (7th Cir. 2013). The union sent a "notice to terminate" that said: "Local 705 does not desire to continue or extend the current CBA beyond its expiration date of March 31, 2007." *Id.* at 716. "[T]he notice in this case did contain the word 'terminate,' and unambiguously identified itself as an 'official notice to both terminate and negotiate modifications.'" *Id.* at

717. The Seventh Circuit could not "imagine a notice of desire to cancel or terminate the Agreement that was any more clear." *Id.* at 716 (cleaned up).

Similarly, in *Univar Solutions*, a union notified an employer that it wanted to re-negotiate or revise a CBA, and the employer acknowledged the request and added that it too proposed modifying or terminating the CBA. 148 F.4th at 429. The district court found that this exchange did not unequivocally convey the employer's desire to terminate the CBA, but the Seventh Circuit reversed. *See id.* at 429–30. Significantly, to overcome the evergreen clause in that case, a party needed "to provide notice that it desired *to amend* or terminate the CBA." *Id.* at 431–32 (emphasis added) (cleaned up). "In light of the specific language of the CBA, this notice was sufficient for termination." *Id.* at 432.

> Returning to our case, the MOA's evergreen clause says:
>
> The parties hereby adopt and incorporate into this document the [CBAs] between the Union and the [Association], effective from June 1, 2008 through May 31, 2012, covering the above described units (the Contracts). The Contracts and this adoption of the Contracts shall remain in effect up to and including the expiration date of the Contracts. The Contracts shall continue in effect from year to year thereafter, and the parties hereby adopt any successor agreements entered into between the Union and the [Association] unless notice of termination or amendment is given no less than sixty (60) days prior to the expiration date of the Contracts.

Sterling Aff. Ex. 1, at 1. Similar to the evergreen clause in *Univar Solutions*, timely notice of a desire to terminate *or amend* the agreement will prevent yearly renewal after expiration and default adoption of successor CBAs.

However, unlike in *Univar Solutions*, South Shore did not send notice of either a desire to terminate or to amend. Robert Gosline's personal resignation from the Union did not terminate South Shore's MOA with the union overall. Robert Gosline's July 23, 2019 letter said:

10

> This letter is to inform the Plumbers Union Local 75 that I am resigning as a union member, effective June 24, 2019. Thank you very much for the opportunities for professional and personal development that you have provided me during the last 35 years. I have enjoyed working with Plumbers Union Local 75 and appreciate the support provided to me during my tenure with you.

This letter does not express South Shore's "unequivocal" desire to terminate the MOA or its incorporation of the CBAs. Nothing in this letter put the union on notice of South Shore's intention to terminate the MOA. This letter does not name the right party; it refers to Robert Gosline as an individual, not South Shore as an employer. The letter does not mention the MOA, CBAs, or the Funds. The letter does not specify any relevant dates—the soonest the MOA could have terminated would be the CBAs' expiration date, not June 24, 2019. And South Shore had been a signatory to the MOA for seven years, not thirty-five. As in *Transervice Logistics*, the letter does not use the word "terminate" or any synonym. "Resign" and "terminate" "are different ideas as well as different words." *Rutherford*, 707 F.3d at 716. Nothing in the letter expresses South Shore's intent to terminate or amend the MOA.

Robert Goslines' July 2019 letter did not terminate the MOA. Therefore, the MOA and its incorporation of the CBAs continued in force under the evergreen clauses. Based on the undisputed facts, South Shore was obligated to contribute to the Funds, yet it hasn't contributed since January 2022. The Funds are therefore entitled to summary judgment on this claim.

## II.   The Funds are entitled to summary judgment on their LMRA claim against South Shore.

Section 301 of the Labor Management Relations Act permits unions and employers to file suit for CBA breach in federal court, or to remove such a case to federal court. Suits regarding contracts between an employer and a labor organization "may be brought in any

district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185. Grounded in promoting "industrial peace," the LMRA supports "a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations." *Contempo Design, Inc. v. Chi. & Ne. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 544 (7th Cir. 2000) (quoting *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 455 (1957)).

As discussed above, because of the evergreen clause, South Shore's obligations under the MOA have continued. The MOA is a contract between an employer and a labor organization. The undisputed facts show that South Shore failed to contribute to the Funds as required. "When parties collectively bargain, as the parties here did, to an agreement that vests in employees [benefits covered by ERISA], a breach of the agreement violates ERISA in addition to the LMRA." *Temme v. Bemis Co.*, 762 F.3d 544, 549 (7th Cir. 2014). Accordingly, the Funds are entitled to summary judgment on their claim that South Shore violated the LMRA.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT ON CLAIMS AGAINST THE GOSLINES

I now turn to the cross-motions for summary judgment on claims brought against the Goslines personally. "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: a court construes facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Cook v. Greenwood Hosp. Mgmt., LLC*, 704 F. Supp. 3d 874, 877 (E.D. Wis. 2023). "When cross-motions for summary judgment are filed, '[i]n effect the judge is asked to decide the case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery.'" *Id.* (quoting *Cook Inc. v. Bos. Sci. Corp.*, 333 F.3d 737, 741 (7th Cir. 2003)).

12

As an initial matter, I take these facts from the Funds' proposed findings of fact, which were uncontroverted and therefore deemed admitted for the purpose of deciding summary judgment.[2] *See* Pls.' Facts, ECF No. 34; E.D. Wis. Civ. L.R. 56(b)(4). The Goslines' proposed findings of fact were also uncontroverted,[3] but many of the Goslines' proposed facts were legal conclusions rather than facts. *See* Defs.' Facts, ECF No. 40. "[U]ltimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary-judgment motion." Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2738 (4th ed. 2010).

The Seventh Circuit has endorsed local rules that clarify the obligations of a party opposing summary judgment: "district courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). The Seventh Circuit has also "repeatedly upheld the strict enforcement of these rules, sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts." *Id.*

## BACKGROUND

In November 2011, husband and wife Robert and D'Ann Gosline formed South Shore as a two-member LLC. *See* Pls.' Facts ¶¶ 1–2. D'Ann acts as South Shore's bookkeeper. *See* Pls.' Facts ¶ 5. Robert leads general operations: recruiting, plumbing, and managing employees. *See* Pls.' Facts ¶ 6.

---

[2] The Goslines' response to the Funds' proposed facts did not cite to the record. *See* Def.'s Resp. to Pls.' Facts, ECF No. 42; Fed. R. Civ. P. 56(c)(1); E.D. Wis. Civ. L.R. 56(b)(2).

[3] The Funds submitted an omnibus motion to strike, substantive response argument, and responses to the Goslines' proposed findings of fact. Per local rules, a concise response to a moving party's proposed facts "must contain" "a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph." E.D. Wis. Civ. L. R. 56(b)(2)(B)(i).

The Goslines don't recall making an operating agreement when they incorporated South Shore. *See* Pls.' Facts ¶ 3. The Goslines do not hold formal meetings and did not take minutes during informal conversations about South Shore. *See* Pls.' Facts ¶ 7. South Shore didn't pay Robert or D'Ann a wage or salary. *See* Pls.' Facts ¶¶ 10–11. Robert took a $6,000 owner's draw in 2024, and D'Ann took a $500 owner's draw in 2024. *See* Pls.' Facts ¶¶ 12–13. For tax years 2022 through 2024, the Goslines filed federal taxes jointly, using Schedule C (Form 1040, Profit or Loss from Business, Sole Proprietorship), identifying South Shore as a sole proprietorship with Robert Gosline as the sole proprietor. *See* Pls.' Facts ¶¶ 14–15.

South Shore operates out of the Goslines' home. *See* Pls.' Facts ¶ 16. Between 2022 and 2025, South Shore's checking account paid $28,078.35 in mortgage payments on the home. *See* Pls.' Facts ¶ 18. There is no lease agreement for South Shore's use of the property, and the Goslines have not reimbursed South Shore for these mortgage payments. *See* Pls.' Facts ¶ 22. Robert and his mother co-own a van used exclusively by South Shore; Robert is the car insurance policyholder, and South Shore pays the insurance premiums. *See* Pls.' Facts ¶¶ 51–55. South Shore owns two vehicles used for both business and personal purposes. *See* Pls.' Facts ¶¶ 56–58.

In 2022 to 2025, South Shore's checking account paid for: cable television, cell phone service for family members, utility bills, Robert's eye doctor, a purchase at a bird feeder store, sanitation services from Milwaukee Water Works, items at CVS, concessions at a Milwaukee Milkmen game, a vet bill, restaurants, hunting and fishing licenses, a purchase from a garden center, a helicopter ride, pet photos, CPAP equipment, and a TV from Best Buy. *See* Pls.' Facts ¶¶ 22–45. Robert occasionally used his personal credit cards for South Shore expenses. *See* Pls.' Facts ¶¶ 46–48. South Shore's checking account paid Robert's personal credit card

14

balances, totaling $47,002.52 between January 2022 and March 2025. *See* Pls.' Facts ¶¶ 49–50. The Goslines have not reimbursed South Shore for personal expenses. *See* Pls.' Facts ¶¶ 61–62. On March 31, 2025, South Shore's checking account balance was $2,192.82. *See* Pls.' Facts ¶ 63.[4]

## DISCUSSION

### I. The Funds are not entitled to summary judgment against the Goslines.

The undisputed facts do not show that the Funds are entitled to summary judgment as a matter of law on their veil-piercing claims against the Goslines personally. An LLC like South Shore is a legal entity separate from its shareholders. *See Consumer's Co-op of Walworth Cnty. v. Olsen*, 419 N.W.2d 211, 214 (Wis. 1988). Shareholder liability is limited to the amount he invested in the LLC. *See id.*; *In re Kaiser*, 791 F.2d 73, 75 (7th Cir. 1986). "[T]he principle of limited liability is a cornerstone of corporate law." *De Breceni v. Graf Bros. Leasing, Inc.*, 828 F.2d 877, 879 (1st Cir. 1987). "But like almost all legal principles, the principle of limited liability has exceptions." *In re Kaiser*, 791 F.2d at 75. "An exception exists when an individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 612 (7th Cir. 2009) (citation modified). "Then a court may pierce the corporate veil, and the individual or entity may be charged for the underlying cause of action. The point is to prevent those who disregard the corporate form from then relying on it to avoid liability for their wrongdoing." *Id.* at 610 (internal citations omitted).

---

[4] This proposed fact is the subject of the motion to strike on the basis that the Goslines' bank account was not disclosed during discovery. This proposed fact is ultimately not material and will not be considered. The motion to strike will therefore be denied as moot.

**A. The undisputed facts do not support veil piercing.**

"Veil-piercing is an equitable remedy governed by state law." *Laborers' Pension Fund*, 580 F.3d at 610. This court has "jurisdiction by virtue of the funds' original claim for relief under ERISA." *Id.*; *Peacock v. Thomas*, 516 U.S. 349, 353 (1996). Under Wisconsin law, to establish that the Goslines should be liable for South Shore's obligations, the Funds must show:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Consumer's Co-op*, 419 N.W.2d at 218–19. Courts have often conflated these requirements into just two, noting that the corporate veil may be pierced when "there be such unity of interest and ownership that the separate personalities of the corporation and the individual [shareholders] no longer exist; and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Id.* at n.5.[5]

The plaintiffs have little trouble satisfying the first element. The undisputed facts show that the Goslines had control over South Shore such that South Shore had no separate mind, will, or existence of its own. The Goslines significantly intermingled personal and business expenses and lacked formality in business practices. Specifically, the Goslines failed to

---

[5] The parties, like many courts, sometimes conflate the "alter ego" *theory* with the veil-piercing *remedy*. "Alter ego" is a theory that allows a court to pierce the corporate veil or, in the case of a parent corporation, to find liability against that corporation in addition to the subsidiary. Veil-piercing is the remedy whereby the corporate form is disregarded, or "pierced," and the plaintiff is allowed to proceed against the individual shareholders.

16

maintain minutes from meetings; they used personal and business accounts interchangeably; they never took wages; South Shore's checking account paid the Goslines' home mortgage; and they didn't reimburse South Shore for personal expenses. Wisconsin courts have considered similar facts controlling in finding that a business does not have an existence separate from its shareholder. *See Wiebke v. Richardson & Sons, Inc.*, 265 N.W.2d 571, 574 (Wis. 1978) (shareholder used corporate checking account as personal checking account and seldom took wages); *Olen v. Phelps*, 546 N.W.2d 176, 180 (Wis. Ct. App. 1996) (shareholder handled decisions informally, failed to keep minutes of meetings, and used company funds to satisfy personal debts and mortgage payments); *Sprecher v. Weston's Bar, Inc.*, 253 N.W.2d 493, 498, 500 (1977) (shareholders didn't conduct meetings or keep records of meetings, and the business had no substantial assets).

However, the Funds have not conclusively shown that the Goslines used their control of South Shore to commit a fraud, or wrong, or unjust act. As the state supreme court has said, there must be some "injustice" resulting from the failure to follow corporate formalities. *Consumer's Co-op.*, 419 N.W.2d at 214. Many courts have mused about what this means: "[b]ut what, exactly, does 'promote injustice' mean, and how does one establish it on summary judgment? These are the critical, troublesome questions in this case." *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522 (7th Cir. 1991). First, it's clear that the requisite injustice must constitute more than the corporate defendant's inability to satisfy a judgment: "A corporation's inability to pay its debt alone is not sufficient to support a finding of injustice." *NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 727 (8th Cir. 2008); *Sea-Land Servs.*, 941 F.2d at 522 ("The prospect of an unsatisfied judgment looms in every veil-piercing action; why else would a plaintiff bring such an action?"). Instead, the injustice must stem in some way from the

17

defendant's (mis)use of the corporate form itself. In *Consumer's Co-op*, the Wisconsin Supreme Court approvingly cited a then-recent law review article that explained injustice can occur in two scenarios: "when a corporation is so undercapitalized that it is unable to meet debts that may reasonably be expected to arise in the normal course of business or when a plaintiff has been misled by the corporate structure of an enterprise." 419 N.W. at 216 n.6 (quoting Note, *Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law,* 95 Harv. L. Rev. 853, 855 (1982)).

Here, the evidence does not conclusively show that the defendants used the corporate form in a way that perpetrated fraud or caused injustice. At most, the evidence is suggestive of a mom-and-pop plumbing operation that enjoyed a consistently casual relationship with corporate formalities. Plaintiffs suggest we may infer gross undercapitalization from the fact that the company recently possessed a checking account with a mere $2,192 in it. But that does not mean the company was vastly undercapitalized when it was formed, as evidenced by the fact that it made payments to the funds in the past. "The adequacy of capital is to be measured as of the time of formation of the corporation. A corporation that was adequately capitalized when formed but which subsequently suffers financial reverses is not undercapitalized." *Id.* at 218.

The plaintiffs also suggest that the Goslines siphoned money from the business to pay off their personal expenses, including their personal mortgage and even extravagant dalliances like a helicopter ride. Even if true, the allegations here suggest that the Goslines *always* maintained a loose relationship with the corporate form, not that they only recently decided to strip the company of assets to render it judgment proof against claims for unpaid health and pension funds. *Mason v. Network of Wilmington, Inc.*, No. CIV.A. 19434-NC, 2005 Del. Ch.

18

LEXIS 99, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005) ("Even if Personnel [company] was insolvent, there is no evidence in the record demonstrating that its assets were transferred in an attempt to avoid its creditors."). A good counterexample of this is *Continental Casualty Co. v. Symons*, 817 F.3d 979, 994 (7th Cir. 2016), where the Seventh Circuit affirmed the piercing of the corporate veil against a company that owed $25 million to another company but then, after incurring the debt, transferred most of its assets to companies owned by family members. By intentionally rendering itself almost judgment proof on the $25 million debt, it caused an injustice justifying equitable relief. *Id.* Failing to pierce the veil under such circumstances would guarantee the success of what some courts have described as an "intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation." *Sea-Land Servs.*, 941 F.2d at 524. We don't seem to have even a whiff of such asset squirreling here.

In short, it appears likely that this is a case in which the defendants followed sloppy accounting practices but did not necessarily do so with any intent or result of causing an injustice *as a result of the disregard of or use of the corporate form*. Put another way, the breach of the company's obligation to pay the funds seems to have had little or nothing to do with the company's corporate status—the company could have done the same thing even if it had followed corporate formalities to the letter. And of course the flip side is that it *did* pay the funds for several years even while apparently ignoring corporate niceties. *Darnel v. East*, 573 F.2d 534, 538 (8th Cir. 1978) ("The corporation continued to make payments to the benefit funds until 1972, and, in fact, negotiated its own contract with the union. Under these circumstances we find no reason to pierce the corporate veil to resolve the issue presently before the court."). Ultimately, as in *Sea-Land,* the plaintiffs have "yet to come forward with

19

evidence akin to the 'wrongs' found in these [veil-piercing] cases." 941 F.2d at 524. *See also Orlando Residence Ltd. v. Alpert,* 526 F. Supp. 3d 410, 416 (E.D. Wis. 2021) (although the company's comingling of assets "was far from ideal," there was no indication of fraud or injustice). Therefore, the undisputed facts do not show that Funds are entitled to summary judgment on their claims against the Goslines under a veil-piercing theory of liability.

### B. The Goslines' counterarguments are unpersuasive.

For completeness, I will address the arguments raised by the Goslines' own motion for summary judgment.[6] The Goslines argue that veil-piercing does not apply to small, closely-held businesses; they further argue that if the Goslines and South Shore are one in the same, then South Shore would have terminated its agreement with the Union with Robert Gosline's 2019 letter.

First, many of the veil-piercing cases cited throughout this decision concerned small LLCs, several of them run by families. For example, in *Consumer's Co-op*, shareholders were three family members. *See Consumer's Co-op*, 419 N.W.2d at 219–20. In that case, the court cited Wisconsin's closely held corporation law as providing greater flexibility for corporate formalities in small businesses; this flexibility seemingly did not extend to "improper commingling of personal and corporate assets." *See id.* The alter-ego test has also been applied to individuals. *See Ind. Carpenters Pension Fund v. Hammond*, No. 1:18-cv-03176-MPB-RLY,

---

[6] For context, on August 12, 2025, the court granted the plaintiffs' motion to amend the complaint and allowed them to name the Goslines individually under the alter ego and veil-piercing theories described above. *See* Order, ECF No. 29. The court also extended the scheduling order and allowed dispositive motions addressing the newly amended claims. The Goslines filed a motion for summary judgment on November 14, 2025, raising three defenses against the Funds: equitable estoppel, termination, and failure of the Funds to mitigate damages. *See* Defs.' Br., ECF No. 39. However, none of these arguments speaks to the new theory of liability asserted in the amended complaint against the Goslines. Because of the unusual procedural posture in this case, the scheduling order permitted dispositive motions only as to the new theory of liability against the Goslines. I therefore do not address these defenses.

2019 U.S. Dist. LEXIS 231916, at *20–21 (S.D. Ind. Apr. 18, 2019) (citing *Bd. of Trs. of Plumbers Pipefitters Local No. 172 Welfare Fund, et al. v. Matrix Plumbing and Heating Inc., et al.*, No. 2:09-cv-414-TLS, 2012 WL 1066758 (N.D. Ind. Mar. 28, 2012)). Accordingly, there is no basis for concluding that veil-piercing is not a viable remedy with respect to small businesses.

Second, the Goslines argue that if they and South Shore are indeed one in the same, and Robert Gosline resigned from the Union with the 2019 letter, then South Shore also terminated its obligations to the Union. Yet it remains true that the resignation language in his letter would be insufficient to terminate the agreement. But more than that, "the alter ego doctrine is a sword, not a shield, the basis for a cause of action, not a defense." *Lumpkin v. Envirodyne Indus.*, 933 F.2d 449, 460 (7th Cir. 1991) (holding that the defendant could not avail itself of the alter-ego doctrine to make itself party to its subsidiaries' settlement agreement and disclaim ERISA obligations). The purpose of the doctrine "is to prevent a corporation that has acted fraudulently or unjustly from protecting itself from liability by shielding itself with the protective mantle of the corporate form." *Id.* at 459. Although, at this point, the Funds have not met their summary judgment burden on the veil-piercing claim, the Goslines may not use this theory as a shield to impute the Goslines' actions onto South Shore and vice-versa.

In sum, the Goslines' arguments do not entitle them to summary judgment on the veil-piercing claims.

**CONCLUSION**

For all the foregoing reasons, the Funds' motion for summary judgment against South Shore Plumbing LLC, ECF No. 16, is **GRANTED**. The Goslines' motion for summary judgment against the Funds, ECF No. 38, is **DENIED**. The Funds' motion for summary judgment against the Goslines, ECF No. 33, is **DENIED**. The Funds' motion to strike untimely arguments from the Goslines' brief, ECF No. 43, is **DENIED**; the Funds' motion to strike the Goslines' response to proposed fact number 59, ECF No. 45, is **DENIED**. The clerk will contact counsel to arrange a telephonic status conference. In the interim, the parties are encouraged to explore settlement.

**SO ORDERED** this 25th day of March, 2026.

STEPHEN C. DRIES
United States Magistrate Judge